# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. NORMAN BRANCH

**Appeal from the Criminal Court for Shelby County**
**No. 12-00463    Paula Skahan, Judge**

---

**No. W2013-00964-CCA-R3-CD  - Filed July 28, 2014**

---

A jury convicted the Defendant, Norman Branch, of theft of $500 or less and intentionally evading arrest in a motor vehicle.  After a hearing, the trial court imposed an effective sentence of six years, eleven months, and twenty-nine days, to be served in the workhouse. In this direct appeal, the Defendant contends the following:  (1) the trial court erred in allowing him to be impeached with twelve prior convictions; (2) the trial court erred in excluding certain of his testimony as inadmissible hearsay; (3) the evidence was not sufficient to support his evading arrest conviction; (4) the trial court provided an improper jury instruction on the evading arrest charge; (5) the trial court erred in sentencing him as a career offender; and (6) cumulative error entitles him to a new trial.  Upon our thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, Shelby County Public Defender, Phyllis Aluko (on appeal) and Jennifer Case (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Norman Branch.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Katie Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

In January 2012, the Defendant was charged with one count of theft of property over $10,000 and one count of intentionally evading arrest in a motor vehicle. At the Defendant's ensuing jury trial, held in January 2013, the following proof was adduced:

Sarah Carter testified that, in May 2011, she lived in West Memphis, Arkansas. On May 1, 2011, however, she was visiting Memphis, Shelby County, Tennessee. That night, at about 2:00 a.m., she drove downtown in her white 2007 Hyundai Santa Fe ("the Hyundai"). Her initials were displayed on the back of the Hyundai in hot pink, and the Hyundai had Arkansas license plates. She parked in a lot and paid the attendant. She left the Hyundai locked with the windows up. The interior of the Hyundai was in "perfect" condition. She bought the Hyundai new in 2007 for $30,000.

When Carter returned to the parking lot at approximately 4:15 a.m., the Hyundai was not where she had left it. She noticed glass in the space where the Hyundai had been. She called the police to report the Hyundai stolen. She called the police a total of three times, and they responded approximately two-and-one-half hours later. She gave the police a report, and the officers decided to drive around with Carter in the back seat of their patrol car to look for the Hyundai. Carter testified:

> [A]s we took off, we didn't get very far and I saw what I thought was my car and I said, well, that looks like my car driving down the road and they asked me how I knew and I said, well, I have my initials on the back in hot pink and as soon as the [Hyundai] turned, it was my car and then my car turned on its blinker and was going to turn and then just took and [sic] and so the cops took off after him.

In short order, Carter saw the Hyundai stop and someone get out of it and run. As she continued to sit in the back of the police car, an officer chased the suspect and another officer got in the Hyundai and stopped it. After the police apprehended the suspect, she recovered the Hyundai. She stated that one of the windows was "busted out." The glass from the broken window was inside of the Hyundai. Missing from the Hyundai were her "Louie Vuitton purse, digital camera, [her] ipod, Rayban sunglasses, [her] baby carrier, probably about $200 worth of Brandi makeup [she] had just bought that day, CDs[,] . . . 200 or 250 in cash and . . . [her] credit cards." She never recovered any of these items.

Officer James Knighten of the Memphis Police Department ("MPD") testified that he responded to the stolen vehicle call at approximately 6:43 a.m. on May 1, 2011, at a parking

lot on Pontotoc and Fourth in Memphis. Officer Brooks was with him. Officer Knighten noticed glass fragments in the parking spot that Carter pointed out to him. He took Carter's report and put out a broadcast for the missing car. He then placed Carter in the back seat of the patrol car, and they began driving around the area, looking for the Hyundai. Officer Knighten testified,

> [A]s we was [sic] driving I looked to my left because Brooks was driving and I was like, man, that's that's [sic] a white Santa Fe and she looked she said, "That's my car. That's my car," and by that time he was at the stop sign right there at Fourth and Butler just sitting there and all of a sudden he hit his left blinker and he turned left and we saw that back window busted and then she saw those – there was [sic] some pink letters, her initials on the back, that back window. She said, "That's my car. That's my car."
>
> Then we got behind – we hit our lights, siren and he was driving. He'd slow down try to jump out. He was going too fast and he slow down again and try to jump out and he made a block and he end up at Foote Homes and he jumped out while the [Hyundai] was still rolling because it rolled up on a hill. By that time we was [sic] on the radio letting them know we was [sic] in pursuit and Brooks stopped. I jumped out and he jumped out. Billy was behind us. Billy jumped in and stopped the vehicle from rolling and put it in park. [The Defendant] struck out went running in Foote Homes.

Officers Knighten and Brooks both chased the Defendant and eventually apprehended him when they saw him trying to gain admittance into someone's residence.

Officer Knighten testified that they followed the Defendant with their lights and siren on for "like a block." The Defendant got out of Carter's car "in the driveway there." After they recovered the Hyundai, they found a key in the ignition. Carter explained to them that she kept a spare key in the console.

On cross-examination, Officer Knighten explained that "[a] crack pawn is when basically a junkie or somebody who use [sic] crack would like – would give them their vehicle just for that – just for some crack and let them I guess use it or borrow it or whatever, just give them a vehicle for crack."

Officer SirCrease Brooks of the MPD testified that he responded to the stolen vehicle call with Officer Knighten. He testified that, while they were driving around with Carter, they first encountered her car front-to-front at an intersection. When the Hyundai turned, Officer Brooks followed. Before he turned on his blue lights, he observed the Hyundai repeatedly slow and pull over and then resume its course. He thought the driver was looking

-3-

for a place to jump out of the Hyundai and run. Officer Brooks called in for back-up and then turned on his blue lights. At that point, the driver of Carter's car "turned in the first little section of Foote Homes past the little playground and he jumped out of [the] car right there and the car went right up on the hill like that." Officer Brooks identified the Defendant as the person he saw jump out of Carter's car. He stated that he was two to three car lengths behind the Defendant when he turned on his lights.

The Defendant testified that, on the night in question, he was in Foote Homes celebrating the victory of the Memphis Grizzlies basketball team. He explained that, at the time, he lived in Foote Homes "on and off." At about 4:00 a.m. on May 1, 2011, he was shooting dice with two other men after they "had done drugging." He clarified that he had consumed cocaine. They were standing at the corner of Fourth and Vance when a man he knew as "Cut Butter" pulled up in the Hyundai. Cut Butter wanted some of the Defendant's cocaine. The Defendant testified, "when he seen how much I had, now he ready to make – he ready to plea bargain for the truck." The Defendant stated that he gave Cut Butter drugs in exchange for the Hyundai, which had the key in it. The Defendant took over driving the Hyundai and dropped Cut Butter off nearby. The Defendant added that, when he first saw the Hyundai, all of its windows were down. He denied that he ever looked in the back area of the Hyundai. The Defendant began driving the Hyundai around because "it was money out there to be made."

The Defendant admitted to having a long history of using crack cocaine. He also admitted to pleading guilty to nine motor vehicle burglaries between September 2001 and February 2011. He also pleaded guilty in October 2004 to theft of property between $1,000 and $10,000 and, in February 2010, to one count of criminal impersonation and one count of theft of property valued at $500 or less.

The Defendant testified about seeing the police while he was driving the Hyundai:

When I first saw them I had – I had been – when I first saw them I had so much – you see I had a lot of drugs and I had been messing with drugs and I was so high when I seen them, I kind of just stood there for a minute because I didn't know whether to jump out the truck or not . . . so I hit left and when I turned left they come out the driveway and they got behind me so then I'm constantly rear viewing and I'm starting to speed. I'm starting to go faster because like I said, because I was determined I didn't want to get caught with drugs.

The Defendant added: "I had a bag full of cocaine on me." He also had a crack pipe on him.

The Defendant described the ensuing pursuit as "a high-speed chase." He heard the siren but did not stop. He stated that he slowed down or opened his door a few times because he was "fixing to jump out." He decided to jump out when he saw that he "had a nice little space on them." He began running while carrying his cocaine and the pipe in his hand. He ran up on a porch and tried to gain admittance to the apartment, but the man who answered the door would not let him in. The police then took him into custody.

On cross-examination, the Defendant admitted that he was not the owner of the Hyundai. He drove it around looking to sell drugs. He denied that any of the items that Clark testified were missing from the Hyundai were in the Hyundai while he had it. He stated that he had $100 worth of crack cocaine on him when he was arrested. He also stated that he was supposed to have the Hyundai for only an hour and then return it to Cut Butter. He admitted to having the Hyundai for about two hours. He admitted that he was driving the Hyundai around in an area "less than a minute" from the area where Clark had parked it.

On redirect examination, the Defendant explained that he tried to return the Hyundai to Cut Butter after an hour but gave Cut Butter more cocaine instead and continued to drive the Hyundai. When asked if he knew where Cut Butter got the Hyundai, he answered, "no, ma'am, what he told me but I don't know exact –."

Based on this proof, the jury convicted the Defendant of theft of property of $500 or less and intentionally evading arrest in a motor vehicle. After a subsequent hearing, the trial court sentenced the Defendant to eleven months, twenty-nine days for the theft offense and to six years for the evading arrest offense, to be served consecutively. The Defendant timely appealed and raises the following issues: whether the trial court erred in allowing the Defendant to be impeached with prior convictions; whether the trial court erred in ruling inadmissible certain testimony offered by the Defendant; whether the evidence was sufficient to support his evading arrest conviction; whether the jury instruction for intentionally evading arrest was misleading; whether his sentence is excessive; and whether cumulative error entitles the Defendant to a new trial. We will address each of these issues in turn.

## Analysis

### *Impeachment with Prior Convictions*

Prior to trial, the State filed a notice of the Defendant's prior convictions with which it intended to impeach the Defendant should he testify. The notice set forth a total of twenty-seven prior convictions dating in reverse chronological order from February 18, 2011, to September 5, 1990. The trial court heard argument on the State's use of these prior convictions during the State's case-in-chief and determined that the State would be limited to using the most recent twelve crimes. Those crimes consisted of nine burglaries of a motor

vehicle, one theft between $1,000 and $10,000, one theft of $500 or less, and one criminal impersonation. The most distant conviction date of these twelve crimes was September 26, 2001, within ten years of the Defendant's instant crimes. The Defendant argues that the trial court abused its discretion in allowing the State to use these convictions for impeachment purposes because they were too similar to one of the crimes for which the Defendant was on trial and that, therefore, the probative value of these prior convictions did not outweigh their unfair prejudicial impact.

This Court reviews for an abuse of discretion a trial court's decision about the admissibility of prior convictions for impeachment purposes. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). A trial court abuses its discretion on this issue "when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining." State v. Russell, 382 S.W.3d 312, 317 (Tenn. 2012) (citing State v. Gomez, 367 S.W.3d 237, 243 (Tenn. 2012)).

Tennessee Rule of Evidence 609 provides that prior convictions used for impeachment purposes "must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). Moreover, in a criminal prosecution, if the witness to be impeached with prior convictions is the accused, the trial court "upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). As our supreme court has explained,

> The balancing test in Tennessee Rule of Evidence 609(a)(3) requires a trial court to first assess whether the offense is relevant to the credibility of the accused. If the trial court concludes that the offense is relevant to the credibility of the accused, it must also assess whether the crime underlying the impeaching conviction is substantially similar to the charged offense.
>
> . . . .
>
> As a general rule, evidence of convictions for the same type of crime should be admitted sparingly because of the impression on jurors that if a person committed a crime in the past, he committed the offense for which he is on trial. The risk of a jury improperly considering the impeaching conviction as evidence of the propensity of the defendant to commit the charged offense is greatly increased if the impeaching conviction is substantially similar to the charged offense.

Russell, 382 S.W.3d at 317 (citations omitted).

The Defendant's prior convictions for burglary of a motor vehicle and theft between $1,000 and $10,000 were all felonies and, therefore, punishable by imprisonment in excess of one year. See Tenn. Code Ann. §§ 39-14-402(a)(4), (d) (2010) (burglary of a motor vehicle is a Class E felony); 39-14-105(3) (2010) (theft of property valued between $1,000 and $10,000 is a Class D felony); 40-35-111(b) (2010) (setting out the authorized terms of imprisonment for felonies). As recognized by the trial court, all of these prior convictions also were for crimes that involved dishonesty. See State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (recognizing that the offenses of burglary and theft are highly probative of credibility because they involve dishonesty) (citations omitted). As this Court has recognized, "Rule 609 does not require as a threshold matter that prior felonies offered for impeachment involve dishonesty or false statement, as is the case with prior misdemeanor convictions." State v. O. B. Freeman Green, Jr., No. 02C01-9901-CC-00036, 1999 WL 675352, at *3 (Tenn. Crim. App. Sept. 1, 1999) (citations omitted), perm. appeal denied (Tenn. Apr. 24, 2000). Thus, when the prior felony convictions are for crimes of dishonesty, their probative value regarding credibility is greater. State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997).

We also agree with the trial court that the Defendant's misdemeanor convictions of theft of $500 or less and criminal impersonation were crimes that involved dishonesty. See id.; Tenn. Code Ann. § 39-16-301 (2010). Indeed, the Defendant does not contend that these prior convictions did not meet the criteria of Rule 609(a)(3). After determining that all of these prior offenses involved dishonesty, the trial court concluded that "the probative value [of these convictions] as to the credibility of [the Defendant], if he chooses to testify in this case, does outweigh any prejudicial effect on any substantive issues." It is this conclusion with which the Defendant takes issue.

The Defendant points to the trial court's statement that the Defendant's prior convictions were "almost all very, very similar to" one of the crimes for which the Defendant was being tried and the trial court's acknowledgment that

> that creates . . . a difficult situation for the Court and for the jury as far as if they hear about these prior convictions and if [the Defendant] chooses . . . to testify and [the prosecutor] is allowed to question him about *all* of these prior convictions, it certainly is going to be tough for them to set that aside.

(Emphasis added). However, the trial court was referring to the potential effect if the State was allowed to impeach the Defendant with *all* of the Defendant's prior convictions, not merely the most recent twelve. By deciding to limit the State to using only the most recent of the Defendant's many crimes of dishonesty, the trial court was careful to balance the probative value of the Defendant's prior dishonest behavior against the potential unfair

prejudice if the jury was informed about the entire extent of the Defendant's criminal history.

"[T]he fact that a prior conviction involves a similar crime for which the defendant is being tried does not automatically require its exclusion." Blevins, 968 S.W.2d at 893. Moreover, as did the defendant in Blevins, the Defendant in this case "made his credibility an important issue by denying any wrongdoing and asserting legitimate conduct." Id. Finally, the trial court gave the jury a clear instruction that, if it determined from the proof that the Defendant had been convicted of prior crimes, it could consider such proof "only for the purpose of its effect, if any, on his credibility as a witness" and that the jury could not consider such proof "as evidence of his guilt of the offense for which he is now on trial." See O. B. Freeman Green, Jr., 1999 WL 675352, at *3. Under all the circumstances, we discern no abuse of discretion by the trial court in concluding that the State could impeach the Defendant with his twelve most recent crimes of dishonesty. Accordingly, the Defendant is entitled to no relief on this basis.

*Exclusion of Defendant's Testimony*

As set forth above, the Defendant testified that he first saw the Hyundai when Cut Butter drove up in it and offered to "plea bargain" the Hyundai for cocaine. When the Defendant attempted to testify about what Cut Butter told him about the Hyundai, the State objected on the basis of hearsay. A jury-out hearing ensued, and the defense made an offer of proof through the Defendant. The Defendant testified that Cut Butter told him that the Hyundai belonged to his sister, who lived in Arkansas. Cut Butter told the Defendant that he had been trying to rehabilitate himself and that his family was helping him as long as he was "staying in the program trying to get things together." Cut Butter's sister provided him the Hyundai in a show of family support.

The defense argued that this testimony did not amount to hearsay because it was not offering Cut Butter's statements for the truth of the matter asserted but simply as proof of the Defendant's mens rea when he took possession of the Hyundai from Cut Butter. The trial court disagreed and ruled the testimony inadmissible. When the defense lawyer stated that she wanted to make sure that her reasons for offering the testimony were on the record, the trial court added:

> They have been put on the record that you believe that it is being offered not for the truth of the matter. I understand that but that's exactly the way this jury is going to hear it and that's the way they will take it and it cannot be cross-examined because we don't have anybody here to cross-examine, except your client, who has come up with this version or it is true. I don't know but it can't be cross-examined and that's why it's not admissible.

The Defendant now argues that the trial court's ruling was reversible error.

Our Rules of Evidence provide that "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Moreover, "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. In this case, the Defendant wanted to testify about statements that Cut Butter made to him about the origin of the Hyundai. The Defendant, however, was not attempting to prove that the Hyundai actually belonged to Cut Butter's sister. The Defendant was attempting to prove that he did not "knowingly obtain or exercise control over . . . a motor vehicle, . . . the property of Sarah Carter, without the effective consent of Sarah Carter, with intent to deprive Sarah Carter of the said property" as charged in the indictment. See Tenn. Code Ann. § 39-14-103 (2010) (setting forth the elements of theft). That is, the Defendant was attempting to prove his state of mind at the time he took possession of the Hyundai in an effort to assert a defense.

As this Court previously has recognized,

> any time the statement is used to prove the hearer['s] . . . mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

State v. Carlos Jones, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[7], at 8-23 (5th ed. 2005)). Accordingly, we are constrained to hold that the trial court erred in applying the hearsay rule to exclude the Defendant's testimony about what Cut Butter told him about the source of the Hyundai.[1]

A trial court's erroneous exclusion of evidence sought to be introduced by a criminal defendant may rise to the level of a constitutional violation. See State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). Indeed, the constitutional right to present a defense may trump the rule against hearsay. See id. at 433. In analyzing whether a criminal defendant's right to present a defense may have been compromised, we consider three factors: (1) whether the excluded evidence was critical to the defense; (2) whether the evidence bears sufficient indicia of reliability; and (3) whether the interest supporting exclusion of the evidence is substantially important. Brown, 29 S.W.3d at 433-34.

---

[1] We also note that the State's inability to cross-examine Cut Butter about his alleged statements was not pertinent to a determination of whether the proffered statements met the legal definition of "hearsay."

Turning to the first of these factors, the excluded statements referred to the method by which Cut Butter came into possession of the Hyundai. These statements were intended to refute the State's proof that the Defendant knew that he was stealing the Hyundai. However, the Defendant also testified that he gave Cut Butter drugs in order to use the Hyundai for a while. That is, the Defendant testified that he, in effect, rented the Hyundai from the person in possession of it. The Defendant's testimony on this point was to the same purpose as the excluded testimony: that the Defendant did not have the requisite mens rea for theft when he took possession of the Hyundai. The Defendant's admitted testimony to this effect rendered less than critical Cut Butter's excluded explanation of how he, Cut Butter, came to be in possession of the Hyundai.

As to the second factor, the excluded testimony was the Defendant's own. The jury clearly rejected the Defendant's version of events, thereby indicating that the jury found the Defendant to be a less than fully credible witness. Accordingly, we conclude that the excluded evidence bore little indicia of reliability.

As to the third factor, we have held that the trial court erred in excluding the Defendant's testimony about what Cut Butter told him about the Hyundai. Thus, this factor weighs in favor of the Defendant. Nevertheless, taking the other two factors into account, we hold that the trial court's erroneous exclusion of the Defendant's testimony did not violate the Defendant's constitutional right to present a defense. The Defendant testified that he exchanged some drugs for time driving the Hyundai. He denied knowing that the Hyundai was stolen at the time he negotiated his deal with Cut Butter. This proof provided the jury with an alternative theory for how the Defendant came into possession of the Hyundai, a theory that contradicted the State's theory of theft. The jury chose to reject the Defendant's theory of how he came into possession of the Hyundai, a choice that was in the jury's sole prerogative. We are convinced that the jury's verdict would have been the same had the excluded testimony been admitted. Therefore, we hold that the Defendant is entitled to no relief on the basis of the trial court's evidentiary ruling on this point. See State v. Russell Lee Maze, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *20 (Tenn. Crim. App. Apr. 28, 2006) (concluding that "the trial court committed harmless error in excluding the expert testimony . . . and that exclusion of the expert testimony did not violate the defendant's due process rights").

*Sufficiency of the Evidence*

The Defendant contends that the proof at trial was not sufficient to support his conviction of intentionally evading arrest in a motor vehicle. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Tennessee Code Annotated section 39-16-603(b)(1) provides that "it is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1) (2010). The Defendant contends that, when the police signaled him with their blue lights, he immediately turned into a driveway and abandoned the Hyundai. The Defendant asserts that a driveway is not a proscribed locale in the statute and that the only fleeing that took place was on foot, rendering him "only subject to conviction for misdemeanor evading arrest." The State disagrees.

As set forth above, Officer Knighten testified that he and Officer Brooks followed the Defendant for about one block after the blue lights were turned on. Moreover, the Defendant himself testified that he continued to drive away from the police after he heard the siren.

This proof is more than sufficient to support the Defendant's conviction. Accordingly, the Defendant is entitled to no relief on this basis.

*Jury Instructions*

The Defendant also takes issue with the trial court's instructions to the jury on the offense of intentionally evading arrest in a motor vehicle. As to this offense, the trial court charged the jury as follows:

> Any person who commits the offense of fleeing from a law enforcement officer while operating a motor vehicle is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant was operating a motor vehicle on a street in this state; and
>
> (2) that while the defendant was operating such vehicle, the defendant received a signal from a law enforcement officer to bring the vehicle to a stop; and
>
> (3) that after receiving such signal, the defendant fled from the law enforcement officer; and
>
> (4) that the defendant acted intentionally.

The Defendant argues that this instruction "fail[ed] to specify that the jury must find beyond a reasonable doubt that the flight occurred in the motor vehicle."

The Defendant did not raise this issue in his motion for new trial. Accordingly, this issue is waived. See Tenn. R. App. P. 3(e); State v. Reid, 164 S.W.3d 286, app. at 349 (Tenn. 2005). Although the Defendant asserts in his brief that he is entitled to plain error relief, we disagree. This Court will grant relief under the discretionary doctrine of plain error review only when the following five prerequisites are satisfied:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must

-12-

not have] waive[d] the issue for tactical reasons; and (e) consideration of the error [must be] 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). If any one of these factors is not satisfied, we need not consider the remaining factors. Id. at 283.

We hold that the trial court's jury instruction did not breach a clear and unequivocal rule of law. Indeed, the Defendant acknowledges that the trial court's instruction is virtually identical to that suggested in the Tennessee Criminal Pattern Jury Instructions. See T.P.I. – Crim. 27.05(b) (17th ed. 2013). While the Pattern Instructions do not carry the force of law, State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993), we hold that this instruction accurately sets forth the elements of the crime, see Tenn. Code Ann. § 39-16-603(b)(1). Accordingly, we hold that the Defendant is not entitled to plain error relief on this issue.

*Sentencing*

On January 3, 2013, the State filed a "notice of enhancement and impeachment" in which it gave "notice that the Defendant should be sentenced as a Multiple Offender, a Persistent Offender or Career Offender, as applicable, pursuant to Tenn. Code Ann. §§ 40-35-106, 107 and 108, respectively" ("the Notice"). Included with the Notice was a list of twenty-seven prior convictions. The Defendant's trial was held on January 7-9, 2013. The record before us reflects no mention of the Notice by defense counsel at the beginning of the Defendant's trial. The day before the Defendant's sentencing hearing, the State filed its notice of intent to seek enhanced punishment and designated the Defendant's sentencing range as "career offender." Included with this pleading was a list of thirty-nine prior convictions, including sixteen felonies, Classes C, D, and E, and twenty-three misdemeanors.

At the Defendant's sentencing hearing, defense counsel contended that the Notice was both untimely and defective and that, accordingly, the trial court should sentence the Defendant as a Range I offender instead of as a maximum Range III career offender. The prosecutor responded that the issue was waived because the defense did not seek a continuance of the trial. The trial court asked for further clarification from defense counsel, and she responded that the Notice was deficient because it did not "state which range of punishment the State [was] seeking." The trial court then stated the following:

> [Defense counsel], we had a hearing where your client took the stand before I even set this for trial and told him what he was facing if he was convicted as charged of theft of property over the value of ten thousand dollars, a Class C-felony, he was looking at fifteen years as a career offender,

-13-

sixty percent, and that he was looking at six years on intentionally evading arrest in an automobile.

The trial court ruled that the Notice was sufficient.

The trial court then sentenced the Defendant as a career offender to six years for the evading arrest conviction and to eleven-months, twenty-nine days for the theft conviction. The trial court ordered the Defendant to serve his sentences consecutively on the basis of two criteria: he was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood, and he was an offender whose record of criminal activity is extensive. The Defendant now renews his complaints about the Notice and argues that the trial court should have sentenced him as a Range I offender.

Tennessee Code Annotated section 40-35-202 provides as follows:

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel *not less than ten (10) days before trial* or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant on the primary offense, must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions.

Tenn. Code Ann. § 40-35-202(a) (2010) (emphasis added). Our Rules of Criminal Procedure further provide that, if this notice is untimely, "the trial judge shall grant the defendant, on motion, a reasonable continuance of the trial." Tenn. R. Crim. P. 12.3(a). A defendant's failure to request a continuance results in a waiver of the untimeliness of the notice. See State v. Lowe, 811 S.W.2d 526, 527 (Tenn. 1991).

As our supreme court has explained,

> The purpose of the statutory notice of intent to seek enhanced sentencing is to (a) provide fair notice to an accused that he/she is exposed to other than standard sentencing, (b) to facilitate plea bargaining, (c) to enable the accused to make an informed decision before entering a guilty plea, and (d) to a certain extent, to aid in trial strategy.

State v. Livingston, 197 S.W.3d 710, 712 (Tenn. 2006) (citing State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990); State v. Taylor, 63 S.W.3d 400, 412 (Tenn. Crim. App. 2001)). When the notice includes incorrect information, "the inquiry should be whether the notice was materially misleading." Adams, 788 S.W.2d at 559. Moreover, "when the State has substantially complied . . . , an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." Id. Finally, this Court has concluded that a notice satisfies its purposes when the defendant is not misled or surprised by the prosecution's decision to seek enhanced sentencing. See State v. Chase, 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993).

In this case, the Defendant complains that "[t]he [N]otice was defective because it failed to notify [him] of which range of punishment it would seek." While we agree that the State should have specified the Defendant's offender status in the Notice, the record makes clear that the Defendant was well aware prior to trial that, if he was convicted, he was subject to being sentenced as a career offender. Moreover, because the Notice specified twenty-seven of the Defendant's prior convictions, defense counsel would have been able to ascertain the Defendant's offender status. See Tenn. Code Ann. § 40-35-108 (setting forth definition of career offender). Accordingly, we hold that the Notice satisfied its purposes and that the Defendant was not prejudiced by the Notice's failure to designate his offender status as a career offender. The Defendant is entitled to no relief on this basis.

*Cumulative Error*

Finally, the Defendant asserts that he is entitled to relief on the basis of cumulative error. As our supreme court has explained,

> [T]here may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Therefore, it follows that, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." Id. at 77 (citations omitted).

We have determined that the trial court erred in refusing to permit the Defendant to testify about what Cut Butter told him about the Hyundai. However, we have determined that error to have been harmless. We have determined that the Defendant's other allegations of error are without merit. Accordingly, the Defendant is not entitled to relief on the basis of cumulative error.

-15-

## **Conclusion**

For the reasons set forth above, we affirm the Defendant's convictions.

_____
JEFFREY S. BIVINS, SPECIAL JUDGE